CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 10 2019

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

CLAUDE V. BROOME,        )
       )
       Plaintiff        )     Civil Action No. 7:17cv444
       )
v.        )
       )
IRON TIGER LOGISTICS,        )     By: Michael F. Urbanski
       )     Chief United States District Judge
       Defendant        )

### MEMORANDUM OPINION

Claude V. "Mike" Broome ("Broome") filed this lawsuit on September 25, 2017, alleging that defendant Iron Tiger Logistics ("Iron Tiger") violated his rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). Iron Tiger filed a motion for summary judgment, ECF No. 36, to which Broome responded, ECF No. 43, and a hearing was held on August 30, 2019. For the reasons discussed below, the court **GRANTS** Iron Tiger's motion for summary judgment.

### Background

Broome is an African American man who has worked for Iron Tiger since 2008. Iron Tiger delivers finished vehicles for large truck manufacturers around the nation, with locations in several states. Broome works at an Iron Tiger facility in Dublin, Virginia, as a lead man, or decker. He does not have supervisory duties, but advises other employees about their jobs. He has worked in this position for Iron Tiger since 2008.

Broome and a Caucasian coworker, Glenn Ward ("Ward"), have worked together at Iron Tiger since 2008. Broome Depo. Tr., ECF No. 44 at 131. Prior to 2015, they had a cordial

relationship and up until 2015, Broome had never believed or perceived that Ward was a racist or racially biased. Id.

For reasons which are unclear, the relationship between Broome and Ward soured in 2015.[1] In January 2015, Ward approached Broome and according to Broome, the following interaction occurred:

> I was standing there. So he walks up to me and looks at me like, You've got a problem with me? And I looked at him . . . and I said, Man, what are you – I said, What are you talking about? You act like you've got a problem with me.
>
> And I looked at him, I said, Man, you know, I ain't got no problem with you. You know, what are you talking about. So I went to break.

Broome Depo. Tr., ECF No. 44 at 146. When Broome returned from break, Ward approached him and called him "racist n****r." Broome was highly offended, but he laughed and told Ward that he did not appreciate being called that. Id. at 147, 150. There were no witnesses to the exchange, but other employees told Broome that some people in the workplace were saying Broome was a racist. Id. Broome reported the racial slur to Terry Epperly, the assistant terminal manager at the Dublin facility. Id. at 156; Decl. of Terry Epperly, ECF No. 37-8 at ¶¶ 1, 6.

During the following week or two, Ward called Broome a "n****r" three or four more times. Broome Depo. Tr., ECF No. 44 at 152. The second time Ward used the word, he also bumped Broome with a trash can while he was in his bay at work. Broome told him that he did not appreciate what had happened. There were no

---

[1] Some of their coworkers believe that they had a dispute over leftover chicken that Broome had put in a refrigerator at the workplace that subsequently was thrown away by an unknown person. Neither Broome nor Ward acknowledge that the chicken was the origin of their relationship becoming antagonistic.

witnesses to the interaction and Broome did not report it to anyone. Id. at 152-154, 156-157; Epperly Decl., ECF No. 37-8 at ¶ 6.

The third time Ward used the racial slur was when Broome was in a hallway heading toward the restroom and Ward went up to him and said, "I don't like you, n****r." Broome Depo. Tr., ECF No. 44 at 158. Broome said nothing in reply because he could not afford to lose his temper and also because he believed that Ward had management on his side. Broome did tell his coworker, James McMickle, what Ward had said to him. Id. at 160. In a statement attached to his Equal Employment Opportunity Commission ("EEOC") claim, Broome stated that on another occasion in the two-week time frame Ward walked up to him and said, "you need to grow up n****r!" ECF No. 37-3 at 2.

On February 24, 2015, Broome contacted Mark Wade, a union representative who no longer works at Iron Tiger, and reported the slurs. Id. The next day, Wade contacted the director of the union, who contacted John Hummel, vice president of terminal operations for Iron Tiger. Decl. of John Hummel, ECF No. 37-5 at 2; ECF No. 37-3 at 2. At some point thereafter, Hummel traveled to Dublin and met with employees to tell them that harassment would not be tolerated. Hummel Decl., ECF No. 37-5 at 4. The company also conducted employee harassment training via a webinar and both Broome and Ward participated in the training. Decl. of Kristy

DeMeyer, ECF No. 37-4 at pp 2-3. Ward did not use any racial slurs after Hummel met with the employees. Broome Depo. Tr., ECF No. 44 at 165.[2]

Not only did Broome complain about Ward, but Ward complained about Broome. In an email dated March 30, 2015 from Ward to DeMeyer, the human resource manager at Iron Tiger, Ward complained about six incidents involving Broome. According to Ward, on January 23, 2015, Ward was in the restroom when Broom came in, grabbed his (Broome's) crotch and said, "You like big black d***s." On January 29, 2015, Broome was sitting on a tow motor when Ward walked behind it. Broome saw him and started backing up, which caused Ward to hurry and Broome to laugh. On February 3, 2015, Broome went out of his way to bump Ward as they were passing each other. On February 6, 2015, Ward was passing by Broome's work area and Broome shook a hammer at him. On February 11, 2015, Ward passed by Broome's work area and Broome called him a coward and laughed. On February 21, 2015, Ward was taking his trash can out to empty it and Broome stepped in front of him and kicked the trash can. ECF No. 37-4 at 11.

DeMeyer forwarded the email to Hummel, who suggested she talk to Ward and see if he reported anything further. Hummel commented that if they talked to Broome, he would "claim racial discrimination right out of the box." DeMeyer called Ward who

---

[2] In the statement attached to the EEOC charge, Broome stated that on April 15, 2015, after Hummel met with the employees, that Ward walked into Broome's work station and called him a "n****r," ECF No. 37-3 at 2, which conflicts with his deposition testimony that no further racial slurs were made. Broome Decl., ECF No. 44 at 164-165. Also, on the face of the EEOC charge, Broome stated that his coworker used the racial slur on February 22, 2016. In a declaration made in response to the motion for summary judgment, Broome stated that Ward used the racial epithet a total of four times. ECF No. 43-8 at 3. Giving credit to all of Broome's statements, it is assumed for purposes of this summary judgment motion that Ward used the slur three or four times between January and April 2015 and another time on February 22, 2016.

stated that nothing had happened since the February incident and that he just wanted DeMeyer to be aware of what was happening. ECF No. 37-4 at 10.

Although Ward did not use racial slurs toward Broome again in 2015, other incidents occurred. On June 1, 2015, Broome was coming out of the main office when Ward approached him, brushed up against him, laughed, and said he was going to "get" Broome. ECF No. 37-3 at 3.

Also in June 2015, Ward was carrying a four-foot-long aluminum light bar past Broome and almost hit Broome in the head with it. Broome had to duck to avoid being hit and Ward laughed. Id. at 169. Employee McMickle saw what happened and reported it to Epperly, who in turn called DeMeyer. DeMeyer called and spoke to Broome and Ward about the incident and received conflicting stories. McMickle said in a statement that Ward was carrying the light bar as he walked past Broome and that as he turned, the light bar almost hit Broome. McMickle reported the incident because he knew the two had problems and he did not want anyone to get fired. McMickle had no opinion about whether Ward intended to hit Broome with the light. ECF No. 37-8.

In September 2015, DeMeyer interviewed nineteen people at the Dublin facility to try and get to the bottom of the animosity between Broome and Ward. No one she spoke to could substantiate the complaints of either Broome or Ward. DeMeyer counseled both of them regarding their complaints and behavior. DeMeyer Decl., ECF No. 37-4 at 3. Broome claims that DeMeyer told him that he could be fired for stating that Ward called him a "n****r." She also told Broome that Ward said he would make no further negative comments about Broome. ECF No. 1 at ¶ 10.

In February 2016 Broome was using a hand truck to carry three buckets filled with nuts and washers, which he estimated to weigh 200-300 pounds each. As he was walking with the hand truck, Ward came up and bumped Broome and then yelled that Broome had bumped him. Broome immediately went to the office to report what had happened. Ward reported the opposite--that Broome had bumped into him.[3] Broome Depo Tr., ECF No. 44 at 195-199; Decl. of Jack Tatum, ECF No. 37-6 at 3.

Jack Tatum, the terminal manager at the Dublin facility, called a meeting with Broome and Ward in an effort to resolve the issues between them. Also present at the meeting were Alex O'Neal, a union representative, Mark Wade, and Jack Thatcher. Tatum Decl., ECF No. 37-6 at 3. According to Broome, Tatum made it seem like Broome was causing the problems. Ward said that Broome was lying about what happened. Broome Depo. Tr., ECF No. 44 at 201-202, 204. After a few minutes, O'Neal took Ward outside and then came back and started "drilling" Broome and saying that Ward was not what Broome was trying "to portray him to be." Broome responded that Ward had called him a "n****r" on various occasions. Id. at 202. Wade also stated that he had problems with Ward in the past. Id. at 205.

O'Neal suggested that the two shake hands and agree to end their disagreements. Broome shook Ward's hand and left the office, while everyone else remained inside. Id. at 203-204.

---

[3] At his deposition, Broome testified that another employee, Tony Semones, witnessed the incident and was asked about it by Iron Tiger management. Broome said that Semones told management that Ward was getting in Broome's space. Broome Depo. Tr., ECF No. 44 at 111-114. Because the evidence of what Semones said is hearsay, it has not been considered. See Md. Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991) (noting that hearsay evidence cannot be considered on summary judgment).

The next day, February 23, 2016, Wade told Broome that the other people at the meeting thought Broome had shaken Ward's hand too aggressively. Id. at 206-207. Broome denied shaking Ward's hand aggressively. Id. at 207. Based on reports from others at the meeting, Tatum gave written notice to Broome dated February 25, 2016 that he was being suspended without pay for three days because he aggressively shook Ward's hand and tried to intimidate him. ECF No. 37-6 at 5. He also was told that any future actions by him of the same nature would result in further disciplinary action being taken, up to and including discharge. Id. Broome served the suspension and returned to work at Iron Tiger. Broome Depo. Tr., ECF No. 44 at 211-212.

On April 30, 2016, Broome filed a complaint with the EEOC. He complained that on February 22, 2016 he was called a "n****r" by another employee. He said he reported the incident to his union steward and the terminal manager. A meeting was held and after the meeting he shook his coworker's hand. On February 24, 2016 he was given a written warning and suspended from February 25-27, 2016. ECF No. 37-2 at 2.[4]

The next workplace incident occurred more than a year later, in May 2017, when both men complained that they exchanged words in the restroom. Broome reported that when he went to the restroom Ward was already there. Ward approached him from behind and said, "You're stupid, you are a coward, you are a coward, you are a

---

[4] On the EEOC charge form, Broome also said that when he returned to work, he was placed in "lay off status." ECF No. 37-2 at 2. Based on his deposition testimony, it is unclear whether he was out of work and not paid for more than the three-day suspension. Broome Depo. Tr., ECF No. 44 at 217. He does not complain about an additional layoff in his pleadings.

coward" and Broome did not respond. ECF No. 37-6. Ward reported that he was washing his hands when Broome entered the restroom, grabbed some paper towels and asked, "Do you want to suck my d**k?" as he was passing by. Ward told him he was nothing but a coward and left the restroom. Ward added that if Broome sees him in the workplace he stops what he is doing and stares. Ward has not reported it because there is never anyone around to witness the behavior. ECF No. 37-6 at 7.

Both Broome and Ward received letters of reprimand on July 11, 2017, following the last bathroom encounter. Both were told that there had been similar complaints on multiple occasions in the past and both had received previous warning letters.[5] Both were told to consider the letters their last and final warning and that any further similar actions would subject them to further disciplinary action, up to and including discharge. ECF No. 37-6 at 8-9. In early 2018, Iron Tiger installed additional cameras at multiple locations around the facility. Hummel Decl., ECF No. 37-5 at 5; Decl. of David Tatum, ECF No. 37-6 at 4.

Since that time, Broome and Ward have not spoken, but every time they are both in the restroom, Ward records audio on his phone. Broome Depo. Tr., ECF No. 37-1 at 57. Also, while at a grocery store in 2019, Broome saw Ward on an aisle and Ward was openly carrying a weapon, which made Broome uncomfortable. The two saw each other but did not speak. Id. at 104-106. Also in 2019, a coworker, Tim Woodyard, told Broome that other employees were making racist comments but would not repeat what he heard. Id. at 108. Broome also asserted in his deposition that he is

---

[5] This is the only mention in the record that Ward received an earlier warning letter.

ostracized at work and no one will eat lunch with him; that he is left out of conversations; that he is given trucks that are harder to work on than other deckers; his bay is left messy by other shifts; he was not consulted by a supervisor when there was a problem with the saddle on one of his trucks; that he was told he had to clock out when he wanted to leave a dinner provided by Iron Tiger but the people at the dinner did not have to clock out; and when he complained in 2015 about the leftover chicken being thrown out, his complaint was not taken seriously even though he believed that a camera that was in place would have revealed who took the chicken. Id. at 118, 119, 122, 124, 56, 59-60, 61-63.

Other than the three-day unpaid suspension, Broome has not lost pay or benefits as the result of any complaints he made. Broome and Ward both continue to work at Iron Tiger.

On March 15, 2017, the EEOC sent a pre-determination letter to Iron Tiger stating that investigation revealed that Ward repeatedly called Broome a racial epithet. The EEOC found that Broome reported the conduct and was disciplined the next day for an aggressive handshake that occurred during a meeting to resolve the dispute. The EEOC concluded that there was a basis on which to hold Iron Tiger liable for harassment under Title VII and also for finding that Iron Tiger retaliated against Broome by disciplining him after he complained about discrimination. Iron Tiger was invited to provide additional information. ECF No. 43-2.

On June 27, 2017 the EEOC mailed Broome a "right-to-sue" letter telling him there was reason to believe that violations of Title VII occurred with respect to some

or all of the matters alleged in the charge, but no settlement was reached with Iron Tiger. The EEOC declined to bring suit on Broome's behalf and closed its file. ECF No. 1-1.

Broome complains (1) that he is forced to work in a racially hostile work environment in which no one speaks to him and employees are allowed to refuse to work with him because of his race and because he filed an EEOC complaint; (2) Iron Tiger retaliated against him when he complained about being called a racial slur by suspending him for three days without pay; and (3) He was subjected to disparate treatment because he was suspended for the "aggressive handshake" but Ward was not suspended for swinging the light bar at him.

## Applicable Law

### I. Summary Judgment Standard

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The

moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment

unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

## II. Title VII

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ...." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may avoid summary judgment and establish a claim of race discrimination in one of two ways. He may offer direct or circumstantial evidence of an employer's discriminatory animus. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004) (en banc), abrogated in part by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009). Or, he may proceed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Hill, 354 F.3d at 285. See also Foster v. Univ. of Maryland-Eastern Shore, 787 F.3d 243, 249 (4th Cir. 2015) (noting that McDonnell Douglas framework applies in context of retaliation claim).

Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case of employment discrimination or retaliation. If the plaintiff succeeds in doing so, the burden of production shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action. If the employer produces such a reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory. Turner v. Copart, Inc., 744 F. App'x, 836 (4th Cir. 2018) (memorandum opinion) (citing Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 1016)).

## A. EEOC Charge

Title VII gives initial enforcement action to the EEOC. A person alleging discrimination must first file an administrative charge with the EEOC within a certain time of the alleged unlawful act. Chacko v. Patuxent Inst., 429 F.3d 505, 508 (4th Cir. 2005) (citing 42 U.S.C. § 2000e-5(e)(1)). A charge is sufficient when it contains a written statement sufficiently precise to identify the parties and to describe generally the action or practices complained of. 29 C.F.R. § 1601.12(b). After the charge has been filed, the EEOC investigates the allegations and provides notice of the charges to the employer within ten days. 42 U.S.C. § 2000e-5(b). If the EEOC finds reasonable cause to believe the allegations are true, it tries to eliminate the unlawful employment practice by informal methods of conference, conciliation, and persuasion. Id. The EEOC also may file a civil action against any respondent which is not a government agency, or may refer the matter to the Attorney General if the respondent is a government agency. If the EEOC declines to file a civil action, the claimant is informed and has ninety days to bring his or her own civil action. 42 U.S.C. § 2000e-5(f)(1). Thus, filing the administrative charge serves multiple purposes of notice to the employer of the alleged discrimination and initiating agency-monitored settlement or a civil action by the agency. Chacko, 429 F.3d at 510.

The administrative framework also plays a substantial role in focusing the formal litigation that may come afterward. Chacko, 429 F.3d at 509. "If 'the claims raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred.'" Id. (quoting Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995)). However, because lawyers typically do not

complete the administrative charges, courts construe them liberally. Id., (citing Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll., 848 F.2d 457, 460 (4th Cir. 1988)). "[T]he exhaustion requirement should not become a tripwire for hapless plaintiffs." Syndor v. Fairfax County, Va., 681 F.3d 591, 594 (4th Cir. 2012). Nevertheless, "'[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'" Chacko, 429 F.3d at 506 (quoting Evans v. Techs. Applications and Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996)).

Iron Tiger argues that Broome failed to exhaust all of his claims because he did not discuss all of them in his EEOC charge and cites Jones v. Calvert Group, Ltd., 551 F.3d 297, 300 (4th Cir. 2009) in support. Jones held that federal courts lack subject-matter jurisdiction when the charge-filing requirement is not satisfied. However, the Supreme Court abrogated Jones in Fort Bend County, Texas v. Davis, 139 S.Ct. 1843, 1851 (June 3, 2019), holding that Title VII's requirement that plaintiffs file an EEOC charge is not jurisdictional, but "is a processing rule, albeit a mandatory one." Davis did not change Title VII's requirement that a claimant exhaust administrative remedies, but clarified that rather than challenge a plaintiff's claim for lack of subject matter jurisdiction, a defendant must raise the issue as an affirmative defense. Liggins v. G.A. & F.C. Wagman, Inc., No. 5:18-cv-72, 2019 WL 4039637, *3 n. 4 (W.D. Va. 2019).

Broome filed an EEOC charge in this case, but Iron Tiger alleges that the narrative in the EEOC charge alleged a finite series of events that culminated in his layoff status effective March 12, 2016, and that Broom did not check the box alleging a "continuing action." Iron

14

Tiger asserts that in Broome's lawsuit, his allegations are broader and encompass events beginning in January 2015 and continuing intermittently until July 2017.

In Broome's case, he was not represented by counsel when he filed the EEOC complaint and because he is illiterate,[6] he was dependent on the EEOC employee to complete the paperwork. He alleged on the face of the charge that his coworker called him a n****r on February 22, 2016. Although the charge itself consists of three short paragraphs, ECF No. 37-2, someone prepared an additional statement on Broome's behalf that was included with the charge. ECF No. 37-3. In that statement, Broome outlines events beginning in January 2015, including allegations that Ward called him a "n****r" four times, and continuing through February 2016 and his description of events is consistent with the allegations he made in his lawsuit.

In a letter sent to Iron Tiger after the EEOC conducted its investigation, the EEOC enforcement investigator stated that Broome first complained of racial epithets in September 2015 and that "more likely than not," Broome was repeatedly called the racial epithet. The investigator acknowledged that Iron Tiger denied the dispute between Broome and Ward was based on race, but stated that during the investigation, Iron Tiger provided interview notes that were taken during their internal investigations which revealed that Broome complained about being called a racial epithet as early as September 2016.[7]

The court finds that the EEOC charge, along with the accompanying expanded narrative, was sufficient to put Iron Tiger on notice of Broome's race discrimination and

---

[6] It is undisputed that Broome cannot read or write.
[7] Given the context of the additional statement prepared for Broome and the letter from the EEOC to Iron Tiger, this date most likely should be September 2015.

retaliation claims, and to allow the EEOC to attempt conciliation, the two goals served by the filing of an EEOC charge. The court further finds that the claims Broome makes in his lawsuit are related to the charge and the facts developed by reasonable investigation of the charge. Therefore, the court concludes that Broome exhausted his administrative remedies.

Iron Tiger also argues that Broome failed to exhaust his administrative remedies with respect to claims that occurred between January 25, 2015 and February 21, 2016 because he did not file a charge of discrimination within 300 days of the occurrence of the earlier events. Iron Tiger further argues that Broome failed to exhaust his administrative remedies with respect to claims of discriminatory conduct that occurred after March 16, 2016.

In Virginia, which has a state deferral agency, Title VII requires an employee to file a charge with the EEOC within 300 days after the occurrence of the unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). Broome filed his EEOC charge on February 22, 2016, meaning that generally, he must have alleged that Iron Tiger engaged in unlawful employment practices after April 28, 2015. In Broome's case, his description of events, including the uttering of racial slurs by Ward, began in January 2015 and Iron Tiger argues that those claims are barred as untimely.

However, Broome brings a hostile environment claim, among others, and the Supreme Court has held the following with regard to hostile environment claims:

> The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002). "In other words, even if most of the harassing conduct on which a plaintiff relies to establish her hostile work environment claim occurred outside the statutory period, the claim will be considered timely if at least one act continuing the violation occurred within the statutory period." Guessous, 828 F.3d at 222 (4th Cir. 2016). Broome alleged violations that occurred within the statutory period and the court accordingly finds that Broome brought his allegations in a timely manner. Iron Tiger also asserts that Broome failed to exhaust his administrative remedies with respect to claims of discriminatory conduct occurring after March 16, 2016, because the allegations were not included in the charge and he did not file an amended charge. The court finds that the events that occurred after March 16, 2016 were reasonably related to the original complaint and thus Broome sufficiently exhausted them when he filed the EEOC charge.

## B. Disparate Treatment[8]

To make out a claim of disparate treatment based on discipline, a prima facie case is established if the plaintiff shows that he is engaged in prohibited conduct similar to that of a person of another race and that the disciplinary measures enforced against him were more severe than those enforced against the comparator. Bryan v. Prince George's County, Md., 484 F. App'x 775, 776 (4th Cir. 2012) (citing Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985)). "The similarity between comparators and the seriousness of their

---

[8] The Fourth Circuit observes "a strict distinction between claims proceeding with direct evidence of discrimination and those proceeding under the McDonnell Douglas framework." Baker v. City of Chesapeake, 644 Fed. Appx. 222, 223 (4th Cir. 2016)(per curiam). Broome appears to muddle the analyses, arguing first that he has made out a prima facie case, and then that he has direct evidence of discrimination. ECF No. 43 at 15. Nevertheless, his arguments appear to be primarily couched in the McDonnell Douglass framework and will be analyzed within that framework. The evidence of direct discrimination he cites is considered support for his prima facie case and his arguments regarding pretext.

respective offenses must be clearly establish in order to be meaningful." Lightner v. City of Wilmington, N.C., 545 F.3d 260, 265 (4th Cir. 2008). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. Bryan, 484 F. App'x at 777. If the employer articulates such a reason, the burden shifts back to the plaintiff to demonstrate that the employer's reasons are not true, but serve as a pretext for discrimination. Hurst v. District of Columbia, 681 F.App'x. 186, 190-191 (4th Cir. 2017).

Broome complains that he was subject to disparate treatment because he was suspended for three days without pay for allegedly aggressively shaking Ward's hand, but Ward was not suspended for swinging a light bar at Broome's head or for bumping him. Broome asserts that each of those acts was more aggressive than the handshake.[9]

Looking at the summary judgment evidence in the light most favorable to Broome, he fails to show that he was subjected to disparate treatment. The aggressive handshake occurred at a meeting in front of several other people, who submitted sworn declarations describing the handshake as grabbing Ward's hand and pumping it in a hard, aggressive way, Tatum Decl, ECF No. 37-6 at ¶ 7; as Broome approaching Ward and jerking his shoulder very hard, O'Neal Decl., ECF No. 37-7 at ¶ 11; and as Broome approaching Ward, grabbing his hand, pulling him closer and then jerking Ward's hand in a violent manner. Decl. of Jack Thatcher, ECF No. 37-9 at ¶ 12. In contrast, the light bar incident occurred in front of McMickle, who saw

---

[9] Broome also denies aggressively shaking Ward's hand and the court assumes for purposes of summary judgment that he did not do so. However, in making the decision to discipline Broome, Iron Tiger heard statements from various witnesses to the handshake who described it as aggressive. It is the basis of Iron Tiger's decision to discipline Broome that is at issue in his disparate treatment claim, rather than the true nature of the handshake.

Ward turn as he was carrying the light bar and almost hit Broome in the face. Ward did not actually touch Broome and McMickle had no opinion as to whether Ward acted intentionally or not. ECF No. 37-8 at 6.

The conduct engaged in by Broome and Ward is not similar enough for Broome to make out a prima facie case of disparate treatment based on disciplinary action. Broome touched Ward and three witnesses described him as acting forcefully and intentionally. As regards the light bar incident, Ward did not touch Broome and the only witness had no opinion as to whether Ward acted intentionally or accidentally.

Moreover, even if he had made out a prima facie case, Broome has not shown that the articulated reason for the difference in treatment was a pretext for discrimination. Iron Tiger argues that Broome was suspended because several people saw the aggressive handshake, but the only witness who saw the light bar incident could not say whether the act was intentional. Iron Tiger management acted after seeking witness accounts of both incidents and Broome offers nothing in response to show that the given reason was a pretext for discrimination.

Broome also states that there was an eyewitness to Ward's bumping him. However, there were several bumping incidents and Broome does not describe the incident to which he refers and does not name the person who saw it happen. A review of the record does not reveal a bumping incident by Ward that was witnessed by anyone else. Broome has thus failed to make out a prima facie case of disparate disciplinary treatment based on an incident of bumping.

Looking at the evidence in the light most favorable to Broome, he has failed to show that fact issues exist which warrant denying summary judgment on his claim of disparate

treatment based on race. Therefore, summary judgment is entered for Iron Tiger on Broome's disparate treatment claim.

### C. Retaliation

To establish a prima facie case of retaliation, a plaintiff must show that he engaged in protected activity, that the employer took adverse action against him, and that a causal relationship existed between the protected activity and the adverse employment activity. Dooley v. Capstone Logistics, Inc., 764 Fed. Appx. 389, 390 (4th Cir. 2019) (memorandum opinion) (citing Guessous, 828 F.3d at 216). If he makes out a prima facie case, the burden shifts to the defendant to articulate a nondiscriminatory reason for the adverse action. If the defendant does so, the plaintiff must show that the reason is pretextual. Id.

In this case, Broome engaged in protected activity when he reported that Ward had used racial slurs. See Savage v. Maryland, 796 F.3d 260, 276 (4th Cir. 2018) (noting that employee engages in protected activity when he opposes either employment actions actually unlawful under Title VII or employment actions he believes to be unlawful). Iron Tiger took an adverse action against him when it suspended him for three days without pay. See Cepada v. Board of Educ. of Baltimore County, 814 F.Supp.2d 500, 516 (D. Md. 2011) (finding two-week suspension without pay was an adverse action); and Allen v. Rumsfeld, 273 F.Supp.2d 695, 705 (D. Md. 2003) (finding ten-day suspension without pay an adverse action). Because the suspension without pay occurred at the meeting held shortly after Broome reported that Ward bumped him while he was pushing the loaded hand truck and used a racial slur, an inference could be made that the suspension was causally related.

However, Broome's retaliation claim fails for the same reason his disparate treatment claim fails: Iron Tiger provided a legitimate, non-discriminatory reason for the suspension--the aggressive handshake--and Broome has not shown that the reason was a pretext for discrimination. Broome offers only his conclusory allegation that the suspension was imposed in retaliation for his having complained when the record shows that the suspension was punishment for the aggressive handshake. The record also shows that, as discussed more fully below, Broome's complaints were taken seriously, investigated, and addressed by Iron Tiger when evidence was found to support them.

Broome has failed to point to evidence in the record that creates a genuine issue of material fact on Iron Tiger's motivation for imposing the suspension. Therefore, summary judgment is entered for Iron Tiger on Broome's retaliation claim.

### D. Hostile Environment

To establish a race-based hostile environment claim under Title VII, a plaintiff must show that he is subject to unwelcome conduct based on his race which is sufficiently severe or pervasive to alter his conditions of employment and create an abusive work environment. In addition, the conduct must be imputable to the employer. Strothers v. City of Laurel, Maryland, 895 F.3d 317, 328 (4th Cir. 2018).

To establish the first element, unwelcome conduct, an employee shows that the conduct is unwelcome by voicing his objection to the alleged harasser or to the employer. Id. at 328-329. Broome reported the racial slurs made by Ward to Iron Tiger and so has established the first element.

To establish the second element, a plaintiff must show that the offensive conduct is based on his race. Id. at 329. In this case, directing the term "n****r" toward Broome clearly was offensive conduct based on Broome's race. What is not clear is that the later allegations that Ward purposefully brushed up against and bumped into Broome, called him "stupid" and a "coward," almost hit him in the head with a light bar, and threatened to "get him," were based on race. At that point, there was a great deal of animosity between the two men and Ward's behavior could be attributed to motivations besides race. However, because the question of Ward's intent is a fact issue, it will be assumed for purposes of summary judgment that his actions were based on Broome's race and that Broome has established the second element of the test.

The third element requires that the offensive conduct be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Id. at 331 (citations omitted). The severe and pervasive test has both a subjective and objective component. To satisfy the subjective element, the employee must personally and reasonably believe that the conduct rises to the level of a hostile environment, which Broome does in this case.

To assess whether the complained-of behavior objectively creates a hostile environment, courts assess the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). The Fourth Circuit has found that repeated use of a racial epithet creates an objectively abusive working environment.

In <u>Pryor v. United Air Lines, Inc.</u>, 791 F.3d 488, 496 (4th Cir. 2015) (quoting <u>Spriggs v.</u> <u>Diamond Auto Glass</u>, 242 F.3d 179, 184 (4th Cir. 2001)), the court commented that "'use of the word n****r is pure anathema to African-Americans,' as it is to all of us." <u>See also Dunlap</u> <u>v. TM Trucking of the Carolinas, LLC</u>, 288 F.Supp.3d 654, 666 (D.S.C. 2017) (quoting <u>Oladokun v. Grafton School, Inc.</u>, 182 F.Supp.2d 483, 493 (D. Md. 2002) ("No word in the English language is as odious or loaded with as terrible a history."); <u>Lindsay-Felton v. FQSR,</u> <u>LLC</u>, 352 F.Suup.3d 597, 603 (E.D. Va. 2018) (finding that repeated use of "cockroaches" by supervisor to describe employees, all but one of whom were African-American, coupled with use of n****r, was evidence of a hostile work environment based on race); <u>Reid v. Dalco</u> <u>Nonwovens</u>, LLC, 154 F.Supp.3d 273, 290 (W.D.N.C. 2016) (quoting <u>Jones v. City of Boston</u>, 738 F.Supp. 604 (D.Mass. 1990)) ("Without question, the racial epithet of 'n****r' shows an intent to discriminate on the basis of race.") Here, the use of a racial epithet by Ward and directed toward Broome three or four times in 2015 and one time in 2016 created an objectively hostile environment.

After April 2015, even assuming Ward's actions were race-based, it is not as clear that they were pervasive, because they happened sporadically, with two incidents occurring in June 2015, one in February 2016, and one in May 2017. However, the actions by Ward as described by Broome--bumping him while he pushed a heavily loaded hand truck, swinging the light bar, calling Broome a coward--could be considered threatening. Therefore, accepting Broome's allegations as true, Ward's actions created an objectively hostile environment for Broome.

To establish the final element of a hostile environment claim, a plaintiff must show that the offensive conduct is imputable to the employer. If, as in this case, the harasser is a co-

worker rather than a supervisor, the employee must show that the employer was negligent in controlling working conditions, i.e., that the employer knew or should have known about the harassment and failed to take corrective action. Strothers, 895 F.3d at 332-333 (citations omitted); Freeman v. Dal-Tile Corp., 750 F.3d 413, 421 (4th Cir. 2014). Evidence relevant to finding an employer liable for harassment by a coworker includes the employer's failure to monitor the workplace, failure to respond to complaints, failure to provide a system for registering complaints, or effectively discouraging complaints. Vance v. Ball State University, 570 U.S. 421, 448 (2013). "Once an employer has notice of harassment, it must 'take prompt remedial action reasonably calculated to end the harassment.'" Freeman, 750 F.3d at 424 (quoting Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir. 1995)).

The summary judgment evidence in this case shows that in early 2015, when Broome complained about the racial slurs to a union steward, the steward reported the incidents to Hummel, who traveled to the Dublin facility and met with employees to advise them that the company would not tolerate racial or other harassment. Iron Tiger also conducted a training on unlawful harassment on March 18, 2015. DeMeyer Decl., ECF No. 37-4 at 3, 9.

In June 2015, Ward told Broom that he was going to "get him" and the light bar incident occurred. Iron Tiger responded by having DeMeyer interview nineteen people, who, except for McMickle, had no knowledge of Broome's or Ward's behavior. Broome claims that DeMeyer told him that he could be fired for reporting that Ward used a racial epithet toward him. According to DeMeyer's notes, she met with both Ward and Broome, both of whom appeared with union stewards, and told Broome that both he and Ward might lose their jobs if the issues could not be resolved. ECF No. 37-4 at 14.

After the February 2016 bumping incident, Tatum called a meeting with Broome, Ward, and others in an effort to resolve the issues. Because there were no witnesses, neither was punished. However, that meeting resulted in the aggressive handshake, which led to Broome's three-day suspension. Finally, after the 2017 restroom incident to which there were no witnesses, Tatum obtained statements from both Broome and Ward and both were issued warning letters.

Looking at the evidence in the light most favorable to Broome, it cannot be said that Iron Tiger was negligent in its handling of Broome's complaints. Iron Tiger responded promptly each time Broome complained by investigating the complaints and making it clear that harassment would not be tolerated. In addition, Iron Tiger took the proactive step of moving Broome to another bay to create additional work space between him and Ward.

Based on the summary judgment record, the court finds that none of Ward's conduct is imputable to Iron Tiger. Compare Freeman, 750 F.3d at 424 (finding triable issue of employer liability when supervisor, upon hearing complaints of use of the word "n****r" in the workplace, "scoffed and shook her head," "rolled her eyes and went on talking to a co-worker," and took no action); and E.E.O.C. v. Cromer Food Services, Inc., 414 F. App'x 602, 603-604 (4th Cir. 2011) (finding employer failed to take adequate action to protect vending machine delivery person who reported sexual harassment on route when supervisors made light of complaints, told employee harassers were only joking, and did not seek additional information to rectify the problem). Accordingly, because Broome cannot show that a fact question exists with regard to Iron Tiger's response to his complaints about racial harassment, summary judgment is entered for Iron Tiger on Broome's hostile environment claim.

### E. Other claims

In his response to the motion for summary judgment, ECF No. 43, Broome raises, for the first time, additional allegations based on his deposition testimony. Those claims cannot be considered. See Begay v. Stansberry, No. 3:09cv578, 2010 WL 2077016 at *3 (E.D. Va. 2010) ("[Plaintiff] cannot raise new claims in response to Respondent's motion for summary judgment."). In addition, the only evidence he cites in support of most of the additional claims is hearsay from other coworkers. Therefore, the court enters summary judgment for respondent on these additional claims.

### Conclusion

Based on the foregoing, the court **GRANTS** Iron Tiger's motion for summary judgment, ECF No. 36, and **DISMISSES** Broome's Title VII claims of race discrimination. An appropriate order will be entered.

It is so **ORDERED**.

Entered: 12/10/19

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge